Good morning, Your Honors. James Harris on behalf of Universal Music Group. I'll be presenting the argument on behalf of Appellants this morning. Were you splitting up time? No, we're not going to split time. There are two principal reasons why this Court should reverse the fee award. First of all, Class Counsel did not achieve the excellent results, the exceptional results upon which the award was premised, but rather left $40 million on the table in a settlement that 85% of the class rejected. And secondly, Class Counsel had a disabling conflict of interest with respect to 85% of the class. I'd like to take these issues in order. With respect to the exceptional results standard, which is where the District Judge really went astray here, it's often difficult to know whether an exceptional result has been achieved when you look at it in retrospect. But this is an unusual case because we objectively know that an exceptional result was not achieved, and we know that because the settlement that was finally entered into and approved by the District Court was $40 million above the settlement that was negotiated and proposed by Class Counsel. And to give you two additional perspectives to drive that point home, if the Major's Counsel had negotiated and proposed a settlement like that, the moment that our clients understood the significance of the case, we would have been fired, and we wouldn't have had the temerity to submit a premium bill, which is essentially what has happened here. And I think the other thing that is an interesting perspective is, I think it's fair to say, given the disparity between the proposed settlement and the final settlement, that ABC and its counsel, after they inked the proposed settlement, were congratulating themselves on having achieved an exceptional result. The only thing I don't understand here is you were so unhappy with the settlement, you had the right to opt out. Why didn't you just opt out and go in on your own? Well, I don't understand this. Excuse me. As a practical matter, we effectively did opt out. No, you didn't. Let me explain. We never approved that settlement. We got extension after extension after extension to object, during which we did our own investigation and during which we negotiated our own settlement. So as a practical matter, we never agreed to the settlement proposed by Class Counsel. You didn't answer my question. Why didn't you just opt out? Why didn't we opt out? I think we're a little hamstrung here in telling the full story because of the mediation privilege. But if you look at the economic realities. Benefited from the settlement that was already on the table. No, no. That's the point that I'm about to address. We didn't. The initial settlement was an albatross to us in two respects. First of all, it lowered the ceiling on any ultimate settlement. That's the case, and that would tell me as a counsel in your position, I don't want anything to do with this settlement. I'm out of this. We're on our own. We're going to get as much as we can, and you're just an albatross around our neck. Well, if you look at the economic realities, it's a matter of economic indifference to the majors, whether they accept 85% of a $65 million settlement or 100% of a settlement that's 15% lower. And the scenario. No, your comment suggested to me that you could have even gotten more than what you did, than what this settlement is for today. I think that the bar was artificially lowered by virtue of the premature settlement. So then you walk away. You walk away from this whole thing, and you start all over, and you go for it, and you say these guys are just nothing but a burden. But they have really caused nothing but – they've undermined this whole claim. The point that I'm – We don't have anything to do with them. We're out. Let's go. The point that I'm trying to make is that if you look at the economic realities, the party that is benefited by the class settlement structure is ABC. They're the ones who want the entire claim to go away. And so to achieve a settlement with them, we were basically put in the position of having to go along with the class settlement – to go along with the class action apparatus and dispose of claims as to which we had no interest, the 15% rump of the class. Would you say that again? I didn't understand. If you look at the economic realities, we are indifferent – I'm sorry about hitting the microphone. We are indifferent as between accepting 100% of a smaller settlement, a settlement 15% lower than the $65 million, or 85% of the $65 million settlement. The two are the same to us. So the reasonable inference there is that what happened is ABC, in order to negotiate a settlement, to prevent us from entering into a settlement, ABC insisted that we get rid of the entire claim. Oh, I see. So what you're saying is this is like when a defendant is dealing with multiple plaintiffs and they say we'll settle as long as we can close out the whole thing. And that was definitely in ABC's interest. And as a matter of the economic realities, it was not in our interest at all. Or like when a prosecutor makes a package deal. Exactly. The deal is there if everybody's claim can be shut down. Yeah. And the other perspective I'd like to bring to bear on this is whether we opt out or not has no bearing on the quality of the work that was performed by class counsel. And really, class counsel has to earn its fees. It doesn't get to earn its fees by saying that we forfeited our right to object to their fees because we didn't appreciate just how adverse class counsel was. I mean, nobody's suggesting you forfeited your right to object to their fees. It was contemplated that anybody could object to those fees. Any class member could have come in and objected to those fees. But that's the sum and substance of your inquiry. If we did not doubt, then why are we permitted to object? Counsel? Yes. Sometimes class actions are collusive. A defendant that knows it has some exposure colludes with a plaintiff to bring a class action, sell it cheap, and thereby foreclose other class members from bringing individual actions that would cost the defendant a great deal more. Yes. Is there anything in the record to suggest that this is such a case? Circumstantially, yes. I mean, we know that before this class action was filed, Mr. Graubart, one of the two class counsel, negotiated, litigated the exact same claim on behalf of a single plaintiff against ABC. And both Mr. Graubart and Mr. Bleacher in their declarations acknowledged that that claim came first, that it developed evidence of wilfulness on the part of ABC, and that ABC was prompted to settle the class action because they knew of their exposure from the prior case. And I think if you put that perspective on the table and then look at the fact that the ultimate settlement was $40 million above what class counsel negotiated and proposed, I think a reasonable inference is that something along those lines happened here. I'm missing something. Graubart had sued for one person before. For one person, yes. And he recovered. He recovered. And he brought a class action. Yes. Based on the exact same evidence. And the class action got settled really cheap. Really cheap. Is there any more? Well, those are the only facts that are in the record with respect to that, basically. I mean, basically we know that a similar claim had been brought, settled, and the evidence on which this class action was based was developed during that case. Yes. Is it so clear that there was liability? Had it gone to the merits? Well, given the state of the record, it's difficult to argue the merits with the kind of precision that I would were we up on a summary judgment. But I think the facts are pretty clear that ABC, as it admitted in its declaration, excessively used compositions and sound recordings which it was not licensed to use. It synced those onto the masters of its tape, which is a violation of copyright law. It then syndicated those tapes, which is another violation of copyright law. And then it sold them overseas. So I think it's absolutely clear, based on the record. There was some liability. There was years of violative acts on the part of ABC. And if you look at. . . They made a big deal about the statute of limitations. Well, and the statute of limitations is one place where we know what happened. Where we know that there was an inadequate investigation on the part of class counsel. The statute of limitations defense, which ABC trumpeted during its settlement discussion with class counsel, turned out a basic issue of notice. ABC had taken the position that all the class members were on notice of the infringements because they had gotten foreign royalty statements. And it turns out they hadn't. But it also turns out that class counsel didn't investigate that claim. Class counsel never called up the majors and said, did you get royalty statements like this? Were you on notice? And I would submit the reason they didn't do that is informed by the conflict of interest that they had. It's very difficult for class counsel to call up a bunch of companies who you're busy suing and ask them to give you confidential information to prosecute a class action. I mean, that's an inherent conflict of interest. And that conflict reared its head with respect to several of the areas as to which class counsel's investigation was inadequate. With respect to willfulness, with respect to damages, with respect to license values. Were they suing them about anything that overlapped? I mean, I remember the lawsuits against their own clients in the class action were not for slip and falls or rear-enders. But I cannot remember what they were for. The only one that the record discloses the subject matter of is the Rhino suit, which is an antitrust action, which Mr. Bleacher filed about two months after, about three or four months after we received notice of the proposed settlement. What kind of antitrust action? I don't know the details of it. But it's an antitrust action against the majors with respect to pricing issues, is my understanding. And Mr. Bleacher is obviously a well-known antitrust attorney. And there's obviously going to be sensitivity on the part of the majors to give him any kind of information that he could then turn around and use in an antitrust action, which, as I say, he filed such an action while this case was pending and while the majors were conducting their independent investigation of the adequacy of the settlement. So what makes this an unusual case, Your Honors, is first we know that the settlement is objectively insufficient, left $40 million on the table. And we also know, in large part because of the conflicts between class counsel and 85 percent of the class, class counsel did not do an adequate investigation. Those facts alone, I think, compel reversal of the framework. You argued to the district court that they weren't entitled to any fee. We did with respect to the conflict of interest issue. We argued that they were not entitled to any fee with respect to our 85 percent of the settlement fund. And really the question as to whether they had a disqualifying conflict. The district court seemed to take that into account to some respect. The district court did not really in its order. She didn't give them any money for the additional $40 million. Well, she didn't give them any money for the $40, but she gave them 25 percent. Fifteen, was it 15 percent? Twenty-five. No, 25 percent of the additional $25, which pens out to a multiplier when you look at their substantive work of $11.4, which is so far beyond the Lodestar benchmark that this Cayeno said was permissible that it's hard to contemplate. I see the quizzical look on your face. There are two Lodestar numbers that got used. One was the 6.5 Lodestar, which takes into account the $300,000 or $400,000 of time they spent defending their settlement. Can you give me the composition of the 6.9? Pardon me? Do you have the composition of the 6.9 in your mind? How did they arrive at that? That was determined by adding up the amount of time they spent substantively litigating and negotiating the case and adding to it the $300,000 to $400,000, I don't remember the exact number, that they spent supporting their fee application. Their fee application, they spent about 40 percent as much time on that as they did litigating the case. So if you do a Lodestar analysis and you look at their substantive work, that pencils out to a Lodestar of about 11.4, which is way off the charts. Even if you look at all the time they spent, including the time defending their fees, which is really time spent adverse to us, that's still a Lodestar of 6.5, which is well beyond the one to four range that Biscayeno sanctioned. And it simply makes no sense. But to come back to your question as to whether we argued they were not entitled to anything, we argued by virtue of their conflict of interest, by virtue of the fact that they were suing us, they were not entitled to any fee that came from our 85 percent portion of the settlement fund. And really that issue turns on the question of whether the majors are considered clients of class council for purposes of this class action. And there's very little case law on this. The most authoritative guidance on this question comes from the commentary to the model rules, the ABA model rules, which both sides cited. And that commentary says normally class members are not considered clients of class council. And as the case law explains, the reason for that is in the typical class action, you don't know who most of the clients are. I mean, they could be all over the country. You don't know who they are. And also, their interests are so small that there's no likelihood of there being any division of loyalty, either in an absolute monetary sense or a percentage of the recovery sense. But those factors are absolutely flipped in this case. Here, the majors comprise 85 percent of the class. They own 85 percent of the works. And they were so clearly known to class council before the lawsuit started that class council sent letters to four of the five majors asking them to participate as party plaintiffs. And as Mr. Graubart put in his declaration, the reason he did that was he wanted the muscle, that's his term, the muscle of the majors to offset the spending power of ABC. So really, this case with respect to the conflict turns out. Did the majors then say no? They didn't respond. They had absolutely no interest in being represented by people who were busy suing them and who make their living suing other companies like them. So with respect to whether the majors are considered clients of class councils for the purpose of this case, what I would submit is this is the most compelling set of facts you will ever see as to why unnamed class members should be considered clients. If not here, it will never happen. I mean, here it's 85 percent of the class. It's a handful of companies. And they were clearly known to class council who were suing them at the time that they brought the class action. I'll reserve the remainder of my time. Thank you, counsel. May I please the court? I'm Maxwell Bleacher, appearing before the appellees. Could you keep your voice up, Mr. Bleacher? Pardon? Your voice. Okay. Thank you, Judge Feist. I'd like to make three observations before I deal with the arguments, counsel, for the majors' defense. Could you talk louder? I'm sorry. I just can't hear you. The first point I'd like to make is that the standard of review here is abusive discretion. It requires you to find, have a firm conviction that a clear error of law, a clear error of judgment, rather, was committed. That's an extraordinarily high standard, particularly given the fact that this fee was awarded by one of the most highly regarded district judges in the central district. Second point I want to make is, in their brief, they said at page 14, the majors had no notice of the defendant's infringement prior to the proposed settlement in 2003. And then they repeat this misrepresentation at page 37, no notice of the infringements. And yet counsel stands here and admits to you that in 2000, when the case was filed, Mr. Grover sent a letter to each of them except Sony, which we thought was improper because Sony owned one of the defendants. We sent a letter to each of them asking them to join in and participate. But as I told Judge Cooper, at the time we asked them to join in this case, because they were going to be the principal beneficiaries of it, having 85 percent of the industry. At the time we asked them, they were too busy suing 12-year-old girls for downloading songs from the Internet. So you're saying the reason they did not join you as plaintiffs is they were too busy suing 12-year-old girls and not that you were suing them? We weren't suing them yet, and you'll see that that's another misrepresentation. I'm really a little shocked here. Is there something in the record that shows the reason is they were too busy suing 12-year-old girls? No, that's just an argument, Judge Kleinfeld. But when we asked them to come in, they ignored us. He admits they ignored us. No response at all. No response, but that's not so bad. Were you suing them? No, we weren't suing them. When did you start suing them? Well, I'll answer that question. They got the notice of the settlement in 2003. They appeared by independent counsel, independent counsel. They showed up, and they contacted us and ABC with independent counsel in December of 2003. Now, the Robinson-Patman claim that counsel is alluding to was not amended to include the major companies until January of 2004. And the record shows, and it's in our brief, that between 2003 when they first surfaced after learning $25.4 million was on the table, after they learned that, they were giving us kudos, sending us nice letters, saying they're going to augment the settlement. And not only that, they said when we augment the settlement, you guys can get more fees. That's what they were saying. So what you're saying is you negotiated the settlement before you were suing them? Well before we were suing them. The settlement was on the table in the summer of 2003. We didn't add them as defendants to the existing Robinson-Patman case. And when we added them as defendants. Why wouldn't you have then had to elect between representing them in the class action and suing them in the Robinson-Patman case? Because there isn't a single case in the federal system that says that the lawyer in a class action has an attorney-client relationship with the putative class members. Not a single case in the ABA canons. I am not so sure of that. It seems to me we had a case recently on discovery of medical communications where we did say just that. The lawyers had basically said send us medical information so that we can decide whether to include you in the class. The clients sent the medical information. The defendant tried to get what the prospective clients had sent the lawyers. The lawyers said it was privileged and we agreed. I'm not familiar with that case. Apparently the majors haven't found that case. And that may be different because there was an actual disclosure of confidential information. I can see in a securities class action you could be suing some securities holder for, say, a rear-ender. And then you're also bringing a class action for everybody that bought the stock in a company between two dates. You have no idea that it's the same person and the person is a trivial part of the class action. But this is different. These are the biggest copyright holders. And you obviously know who they are. I don't really see how you can. It seems like this is like when somebody walks into your law office and you just have to take a choice. If you take their case, you'll be precluded from some other cases. And you just have to take your choice. I would do respect, Your Honor. I think we cited to you the McKesson Cage on page 50 of our brief, the Atari case, the Third Circus decision, an in re fine paper, and the comment to the ABA model rules of professional conduct 1.7, which expressly articulates what Mr. Harris just acknowledged to you, that there is no attorney-client relationship between the class counsel and the punitive class members. And there is no federal case, barring what you may say where there was an actual disclosure of confidential information, there's no federal case that they have cited or which we're aware exists to the contrary. So there is no attorney-client relationship. So you're saying there is no attorney-client relationship ever, no matter what. Well, if we had acquired confidential information from them, if we had acted directly on their behalf, if they didn't have independent counsel from the moment they surfaced, maybe you could make those arguments. But they didn't come to us and say, we object to the class and we want you to go back and hire eminent New York lawyers to come in and jawbone with ABC until they got more money. We didn't ever represent them. They never gave us any confidential information. We were never authorized after the summer of 2003 to speak on their behalf. Okay, I get that argument. Let me ask you about something else. Let me make one more point that I think is just cogent. You know, if you are representing a client in case A and then you file a case against them in case B, what do you do? What would the client do? We'd come into case B and say, you know, you're disqualified in this case from suing us because you're our lawyer in case A. That's what they do. But they didn't. They never came into Judge Cooper's court in the Mad Rhino case and filed an objection saying we were disqualified. The first time this issue of conflict of interest arose is in respect to this B issue. It was never asserted in the district court either in this case or where it should have been in the Mad Rhino case where they should have come in and said if they really believed it, hey, you can't do this. You're our lawyers in this class action case. But they didn't. That's a very helpful point. Well, that's why I want to be rude just to make sure you understood that. You're not rude. You're doing your job. Thanks. That's the key to it. If they believed there was a conflict, they needed to assert it at the time. And even if they're right, which they're not because there's no federal case saying we're their lawyers, and they had independent counsel, but even if they were right, they waived it. Let me ask you about something else. They got the settlement way, way up. Of course. You want to know why? Well, I want to know something a little different. I want to know did your clients, the smaller sellers of music, did they get more money out of the higher settlement? They did. Or was it a matter of they split up the same money and the big boys get the entire difference? They got more money. They got 15% of the $65 million as opposed to 15% of the $25 million. So they wound up with approximately $5 million more because the majors involved themselves. And one more point I'd like to make to you on this conflict issue. They sent out a lawyer from a fancy law firm in New York, and he spent an hour arguing to Judge Cooper that we shouldn't get the 25% that we asked for. He sat down and never said one word to her about the conflict of interest. There was no argument whatsoever, and she didn't respond to it in her written opinion, presuming, as I think was fair, that they had abandoned that argument. So you have their failure to appear in the Mad Rhino case, or even here, to raise the conflict in a timely way. You have their independent counsel that appeared for them in 2003, and you have the fact that we never consulted with them or gave advice to them. We had no agreement. We didn't get any fees from them. We weren't even allowed to participate in the subsequent negotiation with Mr. Piazza that led to the augmented settlement. They wouldn't let us in. And now they turn around and say, you have a conflict. You are our lawyers. It's ridiculous. Mr. Bleacher, could we sort of – I'd like – the time is already half through. But I'd like to take you – you started out with abusive discretion. Yes. All right. So we heard counsel say that the multiplier that was used here, when you compare your Lodestar hours to the – Another thing I need to – Hold on, hold on. So, you know, we have a, you know, a solid opinion in Vizcano v. Microsoft. Vizcano, yes. Right? And it has an appendix to it. Yes. Where, you know, the panel there was just looking at the multiplier that was used in Vizcano. Yes. And they say, you know, based on our look at other cases and we attach an appendix what those other cases were, class actions, the multiplier here in Vizcano was well within that range. Yes. Okay. So if you take either the 6.5 or their 11 point whatever it is – I'm forgetting the number – 11.5. That number is wrong. Okay, hold on, hold on. But if you take either one of those – let's just take the 6.5. Yes. And you look at the range that was at least documented in Vizcano. Yes. You know, it seems to be sort of at the upper end. It is definitely at the upper end. Right? No question. But it's okay because it's within the range of the Rite Aid case. It's within the range and much lower than the Mary Golan Enterprises case. And it's about the same number as in the IDB Communications Group case on page 2 of this appendix. But it is at the upper end. Yes. It is at the upper end, definitely. And if you take their other number that he threw out here today, I hadn't really thought about that one. He said 11.5 or 11 something or other. That really takes you over the edge. Right. But the actual mistake he made in that is he says that we augmented our time in connection with the fee. That's just flat wrong. He can't show that. What happened is after they negotiated the new settlement, we as class counsel wanted to make sure that the class was adequately protected. And one of the things we did, they were making the claim that this settlement wouldn't happen unless they got 85 percent of the money. Well, we did a due diligence on the record of this case to determine that they were entitled to 85 percent of either the publishing or the sound reporting fees of the settlement. And we determined that they were. But that took a lot of time. We also required them under the new settlement to send out a new notice to the class. And we also required them to give the class now a chance to object to this settlement as it was renegotiated. So we spent a lot of time on due diligence to determine that their claim of 85 percent was right. And we spent a lot of time renegotiating the terms of the notice that went out to the class members and getting Judge Cooper to approve that. And so when he stands here and tells you it was to augment the fee, that is simply wrong, and I challenge him to document it. What we did was to protect the interests of the class, and ABC told the court that's what we did. And made sure afterwards that the class was adequately protected. Counsel, as you know from my previous question to your adversary, I always worry in class actions about collusive arrangements between class counsel and defendants. It's just so useful to a defendant to get sued in a class action if they can work things out with class counsel, because they can shut down everybody's claim. What is there in the record here to show the true adversity? If we were collusive, why did we send the letter to the majors? Why did we try to get them into the case? Well, I think they answered that. They said ABC said we don't want to settle unless we can shut down everybody's claim. Right at the outset in 2000, Mr. Graubert, and I'll give you the record references, he sent letters to the majors, except Sony, because as I say, Sony had a defendant in the case. So we sent letters to the other majors, Bertelsmann, Universal, Warner Brothers, or its subsidiaries, and one of them I've left out. There were five then, there's only four now. I don't see why that's inconsistent. Why would we ask the majors to join us in the prosecution of this lawsuit if the idea was collusive to exclude them? You run up the amount. No, not that the idea is to exclude them. You didn't understand my question. In big-time PI, the little bit of involvement I had on the plaintiff's side, one of the irritating things that would happen is basically the defendant would try to bribe the lawyer to throw the case for his client. It doesn't work so well if your client is an actual live person that you have a relationship with across your desk. Right. In class actions, there is no live client sitting across the desk ready to get mad at you. So it makes a whole lot more sense to basically bribe the lawyer to throw the case, and it's not unusual to have an essentially collusive class action. I had one recently where the lawsuit was filed on the same day that the proposed settlement was filed. This settlement took 15 months to negotiate, and Judge Cooper made a finding that we did a hell of a job to get him that amount of money, considering that neither class was likely to ever get certified. And that's the difference between our settlement and theirs. They had four big guys with lots of money who came in with their own Wall Street lawyers, and they were able to sue without any worry about certification. What's the evidence that ABC was really fighting you on that smaller settlement that you negotiated? You have to rely on Judge Cooper, who went through the painful process of continuing time after time the approval hearing because we were continuing to negotiate the nuances of a very complex settlement, which had two classes, one class for composers and publishers and one class for sound recording. As I recall, there was never a deposition. That's correct. We didn't need any depositions. No motion practice? They made a motion to dismiss. We amended the complaint. They were satisfied that we'd cured the defects, and we moved on. And shortly thereafter— Never had to depose anyone at ABC. No, we got declarations from them. They volunteered declarations for you? I think we asked them for declarations in lieu of depositions, and they gave us that. How many hours did you show? I can't remember precisely, but our timesheets are in the record. Well, most of the time was spent not in an adversarial fashion with them in litigation. It was mainly spent to determine the scope and size of the class members. That's what the major problem was. Once there was a settlement, we didn't care about litigating on the merits. The real issue was what songs were to be included and over what period of time. Of course, one of the things we did for this class was to go back 30 years. This copyright infringement had been going on as a purposeful practice on the part of ABC for 30 years, and we got all of those people compensated going back that period of time. And we did that in the face of the fact that there was no serious dispute that the sound recording class was not ascertainable, as we've tried to point out to you. Oh, and one of the other things we did is when we started out, based on Mr. Robert's Franklin complaint, all we had was a single soap opera, which was General Hospital. But as we did, as we collected this massive amount of data, what ABC describes as tens of thousands of cue sheets and other documents, we now found out that they were doing the same thing on two other soap operas. That would be consistent with them wanting to make sure that all of the music owners for all of their soap operas would be barred from ever suing them. So they volunteer that, hey, we didn't just steal music on General Hospital. We stole music on a whole lot of soap operas, and here they all are. I have no doubt that they wanted to get as much protection as they could. And they said, ABC said, unless you think their lawyers are lying, and the judge found that we had a hard time getting $25.4 million in a case in which we could not even identify the sound recording members. I'll give you an illustration. If on General Hospital they played an extract of White Christmas. Eighteen months with no depositions to get $25 million doesn't sound like that hard a time. Well, it's because we were looking at tens of thousands of documents and then running out. What's more, most of these music owners, or an awful lot of the little guys, they're going to be dead. There's nobody even around to get the money. Well, they got the money already. But I think what you're not seeing is you had publishers and songwriters. Many of them had songs that were written by two and three and four people. It presented an enormous amount of complexity. What if the money went to the publisher? How did we ensure that the composer was going to get his share of the publisher's payment? That was a complexity. On the songwriter's side, we couldn't figure out, in many instances, the cue sheets didn't show whose record they used. So if they used the record, a recording of White Christmas, and there's 82 people that recorded White Christmas, how do we know who was entitled to the money? That class would never have been sustained. That's the dominant probability, and that's what we were bargaining against. The likelihood that the sound recording class, the chance of getting that certified was almost zero, and the other one had a chance of getting certified, but it was really difficult because of all the complexities, the multiple composers, and the conflict between the publisher on the one hand and the composer on the other. So it was a very difficult situation to get certified. Judge Kleinfeld just said it looks like liability was sort of basically conceded here, and that the real dispute was the extent of their potential damages, and that's what the focus was. So the case wasn't really vigorously litigated because the focus then became on how do we measure the scope of damage? Once you decide to settle, that's true, but ABC laid out some serious defenses, one on the statute of limitations. So instead of getting the three years the Copyright Act authorizes, we got recovery going back 30 years. But they didn't file a motion for summary judgment on the statute of limitations. They didn't force you to do discovery and then file some sort of summary judgment motion. No, but they didn't file a motion for summary judgment trying to cut off the deadline, you know, the date on their liability. They didn't do anything like that. They didn't. But we had lots of discussions with them. They pointed out to us that many of these clips on the program were 10 seconds or less, and they would have been ousted under the de minimis standard that this court has established. I was just going to finish my remark, though, Mr. Bleacher, you know, how hard a case is fought, at least when I was at district court, sort of factored in into where I thought the benchmark should, the rate or the percentage of the fund should fall. We have cases that say 25% is the benchmark, and you could go down and you could go up. And you could also take a look at the Lodestar amount. And while I may have, you know, taken that into account a little bit more than maybe Judge Snyder did. Cooper. It's really her, you know, she gets the first call. Not Snyder, but. Judge Cooper. Cooper. She gets the first call. And, you know, she's got a lot, there's a wide range of discretion on her part. That's my point. You individually may have done less. Maybe you would have done more. I doubt that. But the question here is, can you say with a firm conviction that having looked at the work we did, the extension of the case to the three things, the 30-year recovery, the high improbability of getting the class certified, the failure of the majors to lift a single figure to help us get more money, that the 25.4 million, it's an insult for him to come here, stand here, and say that we left money on the table. They didn't step forward, and that's why that settlement facing class certification issues was so small. Wait a minute. If you got, once you did a class action, you could get the money for them and you had a duty to get it. We did. And they had 85 percent of the 25.4 million. But until they stepped in, you didn't get the big bump. Pardon? But until they stepped in, you didn't get the big bump. Because we had to get certified on both subclasses in order to move forward. And they didn't. That's the difference. It's not they're great lawyers and we're a bunch of stupid idiots. They didn't need to get certified. They had four people. They threatened to sue separately. They could get whatever they wanted independent of the class. You didn't have class certification? No, only for purposes. You had a settlement class. Right. And ABC made very clear, and we were very much influenced by the strength of the arguments, that the inability to identify the sound recording class members would have assured that class would not have been certified. And while we had what we thought was a shot at certifying. But you had a certified class. Only for settlement purposes. If we had had a certified class, then this settlement, I agree with you, would have been inadequate. We negotiated this settlement with the recognition that the dominant probability is that neither class would have been certified. Thank you, counsel. Oh, can I make one more observation? We are way over time. Just to show the hypocrisy of this, these people sitting at the table to the left suggested that a lawyer, competent, highly respected lawyer, should be allowed to get $3 million. They paid him a million and a half to file an objection for Barbara Streisand to the settlement. They paid him a million and a half out of their money and said he had a right to go to the fund and get another million and a half. So they think that a guy that does an objection gets $3 million, but we. Counsel, this is new material, and you're way over time. Thank you. I'd like to make three or four points, and I'll be as brief as I can. First, with respect to the collusion point, I'd like to draw the panel's attention to Mr. Graubard's declaration, ER 475, paragraph 3, where he says he filed this class action after he had just finished litigating the Franklin case over the identical copyright issues against the exact same defendants, and he said the Franklin litigation, and I'm quoting now, which ultimately settled brought to light documents and relevant information equally applicable to this case. And Mr. Bleachery. Why does that suggest collusion? Well. It just means that he learned something about the claim. That's just the point. And he realized that he could, if he played his cards right, he could mount a pretty large, you know, a good class action. That's just step one. Lawyers do that all the time. That's just step one. I've got four or five more steps here. Take a look at what they didn't do in their investigation. They never examined ABC's profits, even though that's an alternative measure of damages. They never followed up on evidence of willfulness, even though they quoted some evidence in their class action complaint, some internal ABC memos. They didn't interview or depose anybody at ABC to develop additional evidence of willfulness, which would have quintupled the possible statutory damages. They never asked the majors for information regarding their customary license fees, which goes to actual damages. And all they did was they spent a little bit of time with an expert who gave them some notion of customary license fees. They were way too low. They never picked up the phone and asked us what our customary license fees were. And had they done that, they would have known that the potential damages were much, much larger. And I suggest the reason they didn't do that was because of the conflict. Now, Mr. Bleacher says we didn't cooperate with them. The letters they sent to us, and they're in the record, pages 484, 511, 485, they asked us to be party plaintiffs. They never, once the case was going, asked us for any specific piece of information or asked us for any analysis with respect to anything that was at issue in the lawsuit. So they never asked us to cooperate in the prosecution of the claims after they asked us to be their party plaintiffs, which we didn't want to be. So I think you put all those facts together and you put ABC's incentives together, and I think there's strong evidence of collusion. And what's most important is the $40 million they left on the table demonstrates objectively that they didn't do a good job. They did not. Now, Judge Snyder found that there was an arm's length negotiation. Judge Cooper. I'm sorry. We had Judge Snyder in the case that we just finished. Judge Cooper found that there was arm's length negotiations. Well, I would suggest that is contrary to all the evidence which I just cited to you, that finance and abuse of discretion. But most importantly, the critical issue here is whether there was an exceptional result. And I think given all of these factors, given the inadequacy of the investigation, given the $40 million left on the table, we know that the result was exceptional only in the sense that it was a cheap settlement achieved with very, very little time. And I don't think you want to affirm here and create incentives for class counsel to maximize their fees, minimize their work, and then put the burden of all the heavy lifting on the class members who's interested. They basically abandoned during the class settlement by taking a very, very low settlement. Now, with respect to the conflict issue, I'd like to draw the panel's attention to ER 695, paragraph 24 of Patricia Farron's declaration, where she lays out the cases that were filed against the majors. And contrary to what you just heard, the class counsel had cases pending against the majors at all points during this process. They filed a case, Mr. Graubard filed a case against Universal in 1999. That case didn't settle until January of 2002 during the Steiner settlement talks. Mr. Bleacher filed the Greenberg case against the majors in October of 2000. That case is still pending. He filed the Preston versus Columbia case against some of the majors in February of 2002 during the time that they were negotiating with ABC. What about their argument that if you thought there was a conflict of interest, it was incumbent on your side to file a motion for disqualification? Well, we resolved the problem. I mean, that's an option on our part. And we resolved the problem to our satisfaction, we thought, by negotiating. We cleaned up the mess they had created through their inadequate settlement. We negotiated a reasonable settlement, and we put them on notice that we were going to object to their fees. I don't see why we had to do more. We could have done more, but that's certainly not a waiver on our part of a conflict of interest. Well, why isn't it? I mean, if I sue somebody that I'm representing back when I was in practice, I wouldn't do that. But if I did, I would expect them to move to disqualify me. As a lawyer in a case, and if instead what he did was negotiate and work out a deal that made everybody happy, why wouldn't that be a waiver? Well, remember the chronology here. They negotiated this inadequate settlement. Then we get notice of it. And once we get notice of it, that's when we become involved in the case. We do our own investigation. They're not involved. We clean up their mess, and we put them on notice that we're not going to let you benefit from the inadequate work that you did prior to us getting notice of it. It's like everybody wants the good part and not the bad part. They want the good part and not the bad part. You want the good part and not the bad part. But their counsel, they have an attorney-client relationship with us, and California law is quite clear that you're not allowed to benefit financially. Well, it's not clear to me that there was an attorney-client relationship. Well, let me address that. There's no case. I look. There is no case. You got a case? No, no, no, no. I agree with you. There is no case. There's no case. I think the strongest guidance that you get is from the commentary to the model rules, which say ordinarily you're not in a client relationship because of the difficulties of knowing who the clients are and because of the modesty of the interest of each of the unnamed class members. Those factors are 100% reversed here. We have four or five companies that are clearly known to them at the outset of the litigation who own 85% of the claims that are at issue here. And if there's not an attorney-client relationship under those circumstances, then the commentary of the model rules is basically a dead letter. There never will be. You will never see a more convincing, compelling case for finding an attorney-client relationship with unnamed class members. Did you raise this with the lower court? Yes, we did. And it was fully briefed. And it is not mentioned in her opinion? It is not mentioned in her opinion, no. Did you go back and raise it again? We didn't. There was no motion for reconsideration. But when you raised it, did you ask her to disqualify them in any way? No, we asked them to apply the principle that underlies numerous California... You didn't ask her to disqualify them. No, we asked her to apply the well-recognized California principle that an attorney cannot benefit financially from a conflicted situation and to deny them any recovery from the 85 percent of the settlement fund that was to go to the majors. So their percentage should have only come out of the 15 percent? That's right. And that was your... I guess impliedly that was what you suggested to her was a reasonable settlement, a reasonable fee. Well, we said that... Because you told me... You said you didn't argue that she should not award any fees. With respect to the 15 percent of the remaining class members, we don't really have a dog in that hunt. It's not up to us to... You said let them get a fee for the people that they're not suing. Yes. Yes. That's correct. If there are no further questions... Thank you. Thank you for your attention, Your Honor. Steiner v. ABC is submitted. Thank you. We will hear in the raft Burns v. San Bernardino Police Department. Good morning, Your Honors. Lee Otero, I'm one of the attorneys, and for my portion of the case, all I need is about three minutes. This is the 05 case. And if I may start, Your Honors. Counsel. Thank you. Your Honors, my case is quite simple. There was no opposition at trial. There's no opposition on the appeal. I think respectfully, Judge Otero, with Federal Rule 42, consolidated my case in an issue that had nothing to do with the claims that were set forth in the earlier case. We had a case of retaliation. It was similar in nature because the parties were the same.
judges: Kleinfeld, Paez, Hart